# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JEREMY BUTCHER, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TEAMSTERS LOCAL 955, et al., <br><br> Defendants. | Case No. 18-CV-02424-JAR-KGG |

## MEMORANDUM AND ORDER

Plaintiffs Jeremy Butcher and Jeremy Butcher, Inc. bring claims against Defendant Teamsters Local 955 ("Local 955") for conversion, tortious interference with a business expectancy, tortious interference with business relations, and civil conspiracy. Plaintiffs allege the same state-law claims against Defendants John Does 1-5, as well as breach of constructive trust, unjust enrichment, violation of the Kansas Uniform Trade Secrets Act,[1] ("KUTSA"), and violation of the Defend Trade Secrets Act of 2016,[2] ("DTSA"). Before the Court is Local 955's Motion to Dismiss (Doc. 7), brought pursuant to Fed. R. Civ. P. 12(b)(6). Local 955 asserts that Plaintiffs' claims are preempted by federal labor law and that Plaintiff has failed to allege facts sufficient to state a claim upon which relief can be granted. For the reasons set forth in detail below, Local 955's motion is **denied**.

## I. Legal Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, when assumed to be true, "raise a right to relief above the

---

[1] K.S.A. § 60-3320, et seq.

[2] 18 U.S.C. § 1836, et seq.

speculative level"[3] and must include "enough facts to state a claim for relief that is plausible on its face."[4] Under this standard, "the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."[5] The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[6] "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[7] Finally, the court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[8]

The Supreme Court has explained the analysis as a two-step process. For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[9] Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[10] Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[11] "A claim has facial plausibility when the plaintiff pleads factual content

---

[3] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004)).

[4] *Id*. at 570.

[5] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

[6] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[7] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[8] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[9] *Id*. (quoting *Twombly*, 550 U.S. at 555).

[10] *Id.* at 678–79.

[11] *Id*. at 679.

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[12]

Generally, preemption is an affirmative defense and the defendant bears the burden of proof.[13] "A district court may grant judgment as a matter of law under Federal Rule of Civil Procedure 12(b)(6) on the basis of an affirmative defense like preemption when the law compels that result."[14] If the facts establishing the affirmative defense are apparent on the face of the complaint itself, a motion to dismiss is proper.[15] Notably, the Supreme Court has held that preemption arising under the NLRA is jurisdictional in nature.[16] "A court has a duty to examine its jurisdiction to determine whether it can review a matter."[17] Accordingly, although Local 955 pled preemption as an affirmative defense, the Court must consider, *sua sponte*, whether Local 955's motion should be construed as a 12(b)(1) motion.

The Tenth Circuit has not explicitly considered whether *Garmon* preemption should be dismissed under 12(b)(1) or 12(b)(6).[18] A review of other courts' decisions reveals that some courts have dismissed under 12(b)(1), some under 12(b)(6), and others without stating under

---

[12] *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

[13] *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1351 (10th Cir. 2015).

[14] *Id.* at 1341.

[15] *See Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965); *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).

[16] *Int'l Longshoremen's Ass'n, AFL–CIO v. Davis*, 476 U.S. 380, 395 (1986) ("Since *Garmon* and *Curry*, we have reiterated many times the general pre-emption standard set forth in *Garmon* and the jurisdictional nature of *Garmon* pre-emption; we have also reaffirmed that our decisions describing the nature of *Garmon* pre-emption and defining its boundaries have rested on a determination that in enacting the NLRA Congress intended for the Board generally to exercise exclusive jurisdiction in this area.").

[17] *Pliuskaitis v. USA Swimming*, 720 F. App'x 481, 485 (10th Cir. 2018).

[18] The Tenth Circuit has stated, "[i]n cases in which preemption under the NLRA does not automatically deprive both state and federal courts of jurisdiction in favor of the jurisdiction of the NLRB [under *Garmon*], such [NLRA conflict] preemption is *simply a defense* to state law claims touching on areas covered by the federal enactment." *Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1166 (10th Cir. 2004) (quoting *United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. of U.S. & Canada, Local No. 57 v. Bechtel Power Corp.*, 834 F.2d 884, 887 (10th Cir. 1987) (emphasis added).

which 12(b) subsection they are dismissing.[19]  Although the Supreme Court has stated that *Garmon* preemption is jurisdictional, the Supreme Court has also clearly stated that the burden to demonstrate *Garmon* preemption is on the party claiming preemption.[20]

> "The Supreme Court has suggested that, unlike most jurisdictional determinations—which courts can undertake *sua sponte,* Fed.R.Civ.P. 12(h)(3), and under which courts may assume the truth of pleaded facts and make decisions as a matter of law—*Garmon* preemption is a defense that must be raised and proved with facts "the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor . . . . The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold [his] claim."[21]

In *Taylor*, the court reasoned that because the court had initial jurisdiction through diversity to consider whether the conduct was arguably covered by the NLRA, and because the burden to establish preemption was on the party claiming preemption, a motion to dismiss under 12(b)(6) was proper.[22]

Under 12(b)(1), the "the party invoking federal jurisdiction bears the burden of proof."[23] However, the Supreme Court has clearly placed the burden of demonstrating *Garmon* preemption on the party asserting preemption.[24]  To apply the standards of 12(b)(1) when considering *Garmon* preemption would necessarily shift that burden and require Plaintiffs to demonstrate that the Court has jurisdiction over their arguably preempted claims.  The Court declines to impose that contradictory result here.  The case is properly before the Court on

---

[19] *Compare Taylor v. Nat'l Car Rental Sys., Inc.*, No. CIV. 09-1628(WHW), 2009 WL 3260622, at *3 n.5 (D.N.J. Oct. 9, 2009) (noting the wide variation in how courts have handled *Garmon* preemption and finding that the 12(b)(6) standard applies based on the history and purpose of *Garmon* preemption) *with Kastens v. Int'l Ass'n of Machinists & Aerospace Workers*, No. 16-1344-EFM-GEB, 2017 WL 3053994, at *3 (D. Kan. July 19, 2017) (dismissing under 12(b)(1) because the claim was preempted under *Garmon*).

[20] *Davis*, 476 U.S. at 395.

[21] *Taylor*, 2009 WL 3260622, at *3 n.5 (citing *Davis*, 476 U.S. at 395) (internal citation omitted).

[22] *See id*.

[23] *Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1309 (10th Cir. 2005).

[24] *Davis*, 476 U.S. at 395.

diversity jurisdiction and the Court has subject matter jurisdiction to consider whether Plaintiffs' claims are arguably subject to §7 and §8 of the NLRA. Accordingly, the Court will consider Local 955's preemption argument under 12(b)(6) and apply the standard articulated by the Supreme Court in *Davis*.

## II. Factual Allegations

The Court summarizes the facts alleged in the Complaint and assumes them to be true for purposes of deciding this motion. Jeremy Butcher was an Independent Operator for Bimbo Foods Bakeries Distribution, LLC ("Bimbo"). Bimbo developed and acquired, then resold to small businesses and individuals, the exclusive right to purchase, resell, and distribute certain fresh-baked products ("Distribution Rights")—including brands such as Nature's Harvest, Arnold, Brownberry, Oroweat, and Entermann's—throughout the United States, including the Greater Kansas City metropolitan area. Bimbo operated an "Independent Operator Distribution Network," through which it sold and conveyed exclusive Distribution Rights to distributors including Plaintiffs, who would then resell the product to retail food outlets, restaurants, and other institutions within a defined "Sales Area" or "Route." The Distribution Rights included the Route, exclusive Distribution Rights, customer lists, customer data, handheld computing equipment networked with Bimbo's computers, advertising and marketing rights, other business assets, and the actual bakery products for resale.

Plaintiffs executed a bill of sale for the purchase of their Route and have owned from the date of said sale to the present, all rights, title, and interest in the Distribution Rights for Bimbo products in that particular Route in the Greater Kansas City area. Plaintiffs also entered into a Distribution Agreement with Bimbo, effective May 26, 2008, which set forth Bimbo's obligations with respect to Plaintiffs.

In 2011, Bimbo's parent company, Mexico-based Grupo Bimbo, S.A.B. de C.V., purchased Sara Lee Corporation's North American Fresh Bakery ("Sara Lee NAFB") business. At the time, Sara Lee NAFB operated forty-one plants and approximately 4,800 distribution routes. The complementary product lines and geographies gave rise to overlapping routes between Bimbo and Sara Lee.

Around 2017, Bimbo undertook negotiations with Local 955 to establish a new pay schedule for union drivers to take over the Route owned by Plaintiffs and other independently-owned routes in the Kansas City area. Bimbo and Local 955 entered into a Memorandum Agreement by which they agreed to extend their then-current agreement—set to expire on September 29, 2018—for three years, through October 3, 2021. Union drivers began servicing Plaintiffs' Route on June 17, 2018.

Local 955 knew that Bimbo had not properly acquired Plaintiffs' Distribution Rights. On October 27, 2017, counsel for Plaintiffs wrote Local 955, advising that Plaintiffs owned the exclusive rights to distribute Bimbo products in certain geographic areas, and that any action to service Plaintiffs' Route would constitute interference with Plaintiffs' business expectancy. Bimbo attempted to purchase Plaintiffs' Route in furtherance of its agreement with Local 955; Plaintiffs, however, were unwilling to sell. The Distribution Agreement between Bimbo and Plaintiffs provides, "[e]xcept as set forth in this Article, or upon the sale or transfer of all of the DISTRIBUTOR's Distribution Rights, this Agreement may not be terminated or canceled, provided DISTRIBUTOR carries out the terms hereof."[25] The Distribution Agreement does not allow Bimbo to terminate the Agreement except for cause (defined in the Agreement) or death.

---

[25] Doc. 1-1, ¶ 9.1.

On June 26, 2018, Local 955 published an article on the "News" section of its website.

The article states, in part:

- The benefits of hiring a union driver instead of an independent operator are obvious to Teamsters. Every once in a while, it becomes obvious to large multinational corporations as well.

- "Bimbo bakeries is our largest employer, and throughout the years I've consistently pushed them to think differently about their distribution methods—specifically their independent operator model," Bakery and Laundry Conference (BLC) Chairman and Director Dave Dudas said. "Over time, the company has bought out their independent operators (IOs) and given those bread routes to Teamster drivers. This has led to greater sales for the company, which in turn has led to more earnings for our membership."

- The story of how the Teamsters and Bimbo Bakeries provides a fantastic model for building mutually beneficial relationships for union members, the companies they work at and the customers they serve.
. . . .

- **Kansas City, Missouri** . . . the company approached Dave Dudas about a large-scale project that he had been advocating on behalf of for a number of years—the transitioning of an entire geographic area into a Teamsters-only distribution network."

- The BLC successfully *negotiated a plan* for Bimbo Bakeries to *transition* all of the IO routes in the Kansas City metropolitan area to Teamster drivers.

- . . . .the move has led to increased sales, particularly in Bimbo brands that the Teamsters previously weren't selling such as Oroweat, Entenmann's and Thomas.

- "We anticipate that the company will be able to scale up in Kansas City to at least 16 more small stop routes to cover more than 800+ locations that we currently do not service," Dudas said. "The significance of the Kansas City project cannot be undervalued. The company was under no pressure to transition from IOs to Teamster route sales, but because of this program we are adding new members . . . ."
. . . .

- "Before the implementation of this program, we controlled less than 35 percent of the bread routes in the Kansas City metropolitan area," said Woods. "Now we control more than 50 percent, and pretty soon it will be 100 percent. We knew that at a certain point the company was going to switch over to

either our drivers or IOs completely. We needed to figure something out, and we did."[26]

Although Plaintiffs have not sold, and Bimbo has not acquired, Plaintiffs' Distribution Rights, union drivers have serviced Plaintiffs' Route, pursuant to Local 955's "plan" and agreement with Bimbo. Plaintiffs have demanded the return of possession and control of their Distribution Rights.

Following Bimbo's agreement with Local 955, Bimbo prevented Plaintiffs from accessing the computer and software needed to order products and perform the Distribution Agreement; refused to allow Plaintiffs to place orders for products; demanded Plaintiffs make their trucks available for repainting; assigned union drivers and personnel to service Plaintiffs' Route and furnished those employees with tools, marks, and other trade necessities; received and deposited into their own accounts monies from the sale and delivery of products to outlets in Plaintiffs' Sales Area; and refused to pay to Plaintiffs the profits from the sales and deliveries of products since union drivers took over the Route on June 17, 2018.

**III. Discussion**

Local 955 asserts that Plaintiffs' claims fail to state a claim upon which relief can be granted for two reasons: (1) Plaintiffs claims are preempted by federal labor law and (2) Plaintiffs fail to assert essential elements of their underlying causes of action.[27] The Court addresses each issue in turn.

---

[26] Doc. 1, ¶ 23 (emphasis added) (citing https://teamster.org/news/2018/06/bimbo-bakeries-teamsters-do-it-best).

[27] Local 955 also asserts that Plaintiffs' conclusory allegations are not entitled to a presumption of truth. The Court disregards any conclusory statements couched as facts in Plaintiffs' Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

8

### A. Preemption

Local 955 argues that all of Plaintiffs' state-law tort claims are preempted by federal labor laws, specifically the National Labor Relations Act ("NLRA") and the Labor Management Relation Act ("LMRA"), under the principles set forth in *San Diego Building Trades Council v. Garmon*.[28] Under *Garmon* "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."[29] The purpose of *Garmon* preemption is to protect "the primary jurisdiction of the NLRB to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA."[30]

The Supreme Court has elaborated on what it meant by "arguably."

> If the word "arguably" is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in [its] favor. That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been "authoritatively rejected" by the courts or the Board. The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation.[31]

Courts applying this standard do not require that the Board arrive at a particular outcome; rather, the question is whether a court can conclude that the activity is prohibited or protected by the NLRA.[32] In the 12(b)(6) context, "the party claiming preemption bears the burden of

---

[28] 359 U.S. 236 (1959) (*Garmon*).

[29] *Garmon*, 359 U.S. at 245.

[30] *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748 (1985).

[31] *Paper, Allied, Chem. & Energy Workers Int'l Union, Local 5-508, AFL–CIO v. Slurry Explosive Corp.*, 107 F. Supp. 2d 1311, 1329 (D. Kan. 2000) (quoting *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 395 (1986)).

[32] *See e.g., Chamber of Commerce of the United States of Am. v. City of Seattle*, 890 F.3d 769, 795 (9th Cir. 2018); *Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1027 (6th Cir. 2001).

demonstrating that the challenged activity is prohibited [or protected] by the NLRA."[33] In *Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, the Sixth Circuit affirmed the district court's denial of a motion to dismiss because "the Union has offered no evidence demonstrating that its activities are unfair labor practices [under § 8]," and consequently had failed to meet their burden of proof to establish preemption at the motion to dismiss stage.[34] Accordingly, at this stage, Local 955 must establish that the conduct alleged in Plaintiffs' Complaint is arguably within the scope of § 8; namely, that the conduct alleged by Plaintiffs arguably constitutes an unfair labor practice.

Local 955 asserts that because Plaintiffs "are, in effect, arguing that the terms of the CBA" constitute an unfair labor practice, the claims are preempted under §8(e) and/or § 8(b)(4) of the NLRA, or in the alternative, §303 of the LMRA provides the exclusive right of action.[35] Plaintiffs respond that the alleged conduct does not fall within the scope of § 8(e), § 8(b)(4), or §303 because Plaintiffs' state tort claims do not touch on matters giving rise to a claim under the NLRA. The Court finds—based on the facts alleged in Plaintiffs' Complaint—Local 955 has not established that Plaintiffs' claims are preempted.[36]

1. **Section 8 of the NLRA**

Local 955 argues that the conduct alleged in Plaintiffs' Complaint is arguably encompassed by Section 8(e) of the NLRA. Section 8(e) states, in relevant part:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby

---

[33] *Slurry Explosive Corp.*, 107 F. Supp. 2d at 1329 (citing *Davis*, 476 U.S. at 395).

[34] *Nw. Ohio Adm'rs, Inc.*, 270 F.3d at 1028.

[35] Any inference that the plan or agreement alleged by Plaintiffs necessarily refers to the CBA is improper in a 12(b)(6) motion. Here, Plaintiffs assert that Local 955 and Bimbo conspired to convert and tortiously interfere with their business; the existence and nature of the plan or agreement is a question of fact that the Court does not consider here.

[36] The Court will not consider Local 955's argument that § 301 preempts Plaintiffs' claims because Local 955 did not assert this argument in its Motion to Dismiss. It is improper for a movant to raise new arguments in a reply. *E.E.O.C. v. Int'l Paper Co.*, No. CIV. A. 91-2017-L, 1992 WL 370850, at *10 (D. Kan. Oct. 28, 1992).

> such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void . . . .[37]

Section 8(e) prohibits so-called "hot cargo" agreements, by which unions secure agreements from employers to boycott the goods and services of other employers who do not operate under union contracts, which Plaintiffs have not alleged here. "The 'touchstone' and 'central theme' of § 8(e) is the protection of *neutral* employers . . . which are caught in the middle of a *union's dispute* with a third party."[38] Similarly, § 8(b)(4) prohibits any attempt by a labor organization to "threaten, coerce, or restrain any person" for the purpose of forcing or requiring that person to cease doing business with any other person.[39] This activity has been labeled as a "secondary boycott" or "secondary picketing." The purpose of § 8(b)(4) is to "protect neutral employers, i.e., those not directly involved in a *labor dispute*."[40] Notably, "[s]ection 8(b)(4)(A) prohibits union activities designed to force an employer to enter into an agreement which is prohibited under section 8(e)."[41] Thus, the Court will consider preemption based on § 8(e) and/or § 8(b)(4) together.

---

[37] 29 U.S.C. § 158(e) (emphasis added).

[38] *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 84 (1982) (citing *Nat'l Woodwork Mfrs. Ass'n. v. NLRB*, 386 U.S. 612, 624–626, 645 (1967) (emphasis added); *see also R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89-22-1, I.L.G.W.U., AFL–CIO*, 33 F.3d 145, 151 (2d Cir. 1994) ("Contracts that violate § 8(e) of the Act are commonly referred to as 'hot cargo agreements.' The expression derives from the language of § 8(e) barring an employer and union from entering into an agreement under which the employer ceases handling or otherwise dealing with the products of other employers. The goods agreed not to be handled are therefore rendered 'too hot to handle,' and such a forbidden agreement is aptly called a 'hot cargo' agreement."); *Local 210, Laborers' Int'l Union of N. Am. v. Labor Relations Div. Associated Gen. Contractors of Am., N.Y.S. Chapter, Inc.*, 844 F.2d 69, 72 (2d Cir. 1988) ("Section 8(e) was designed to outlaw so-called "hot cargo" clauses in collective bargaining agreements, by which unions would secure agreements from employers to boycott the goods or services of other employers that did not comply with union standards or recognize a union.").

[39] 29 U.S.C. § 148(b)(4).

[40] *Frito-Lay, Inc. v. Retail Clerks Union Local No. 7*, 629 F.2d 653, 659 (10th Cir. 1980) (emphasis added).

[41] *Id*.

Plaintiffs assert that because there is no "labor dispute" or "neutral employer" here, §§ 8(b)(4) and 8(e) do not apply.[42] Local 955 responds that Plaintiffs' interpretation requiring a neutral employer and a labor dispute ignores the plain language of the statute; rather, Local 955 argues, the plain language of the statute only requires "any labor organization and any employer to enter into any contract or agreement . . . to cease doing business with any other person."[43] Local 955's argument that the plain language of the statute establishes preemption, without more, is not sufficient. Rather, Local 955 must "put forth enough evidence" for the Court to find that the NLRB can adjudicate Plaintiffs' claims.[44] Further, the mere fact that a union is the defendant in this case does not establish preemption: "The Board is not involved in this case essentially because the Employer merely filed a lawsuit against the Union."[45]

In evaluating whether Plaintiffs' claims are preempted, the Court considers the purpose of *Garmon* preemption, namely, to protect "the primary jurisdiction of the NLRB to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA."[46] The Supreme Court has clearly articulated the purpose of preemption in the labor context:

> The principle of pre-emption that informs our general national labor law was born of this Court's efforts, without the aid of explicit congressional guidance, to delimit state and federal judicial authority *over labor disputes* in order to preclude, so far as reasonably possible, conflict between the exertion of judicial and administrative power in the attainment of the multifaceted policies underlying the federal scheme.[47]

---

[42] Plaintiffs argue that they cannot present a claim to the NLRB since Local 955 did not "even arguably engage in conduct proscribed by § 8(e)." Doc. 9 at 16.

[43] 29 U.S.C. § 158(e).

[44] *Paper, Allied, Chem. & Energy Workers Int'l Union, Local 5-508, AFL--CIO v. Slurry Explosive Corp.*, 107 F. Supp. 2d 1311, 1329 (D. Kan. 2000) (quoting *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 395 (1986)).

[45] *Subject: Golden Gate Painting*, Case 20-CA-31153-1, 2003 WL 22927229, at *5 (Sept. 29, 2003).

[46] *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748 (1985).

[47] *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of Am. v. Lockridge*, 403 U.S. 274, 286 (1971) (emphasis added).

Similarly, the Tenth Circuit has acknowledged the "sweeping language" of § 8 of the NLRA and grounded its interpretation of the statute in its *purpose*, namely, protecting "neutral employers, i.e. those not directly involved in a *labor dispute*, from direct union sanction."[48] Although "labor dispute" is not a term found in § 8, it is defined within the NLRA: "the term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."[49]

Local 955 points the Court to no cases where a court or the NLRB found a "hot cargo" agreement under § 8(e) or a "secondary boycott" under § 8(b)(4) without a labor dispute. Although Local 955 asserts that the conduct here is "precisely the sort that courts have found to be completely preempted,"[50] both cases involving § 8(b)(4) cited by Local 955 involve a neutral party and a clear labor dispute.[51] Similarly, the cases cited by Local 955 concerning preemption of tortious interference claims involve a clear labor dispute.[52] The Court agrees with Local 955

---

[48] *Frito-Lay, Inc. v. Retail Clerks Union Local No. 7*, 629 F.2d 653, 659 (10th Cir. 1980) (emphasis added).

[49] 29 U.S.C. § 152.

[50] Doc. 10 at 11.

[51] *See generally Ethridge v. Harbor House Rest.*, 861 F.2d 1389 (9th Cir. 1988) (holding *Garmon* preemption applies under § 8(a) when Plaintiff alleges he was terminated in retaliation for his union-organizing activities); *Smart v. Local 702 Int'l Bd. of Elec. Workers*, 562 F.3d 798 (7th Cir. 2009) (finding *Garmon* preemption under § 8(b)(4) when a union coerced the owner of a sports complex to terminate his agreement with the neutral plaintiff and threatened to withhold services if the owner did not employ union workers instead of the plaintiff); *Monarch Long Beach v. Soft Drink Workers, Local 812*, 762 F.2d 228 (2d Cir. 1985) (finding *Garmon* preemption under § 8(b)(4) of a state-law claim for punitive damages where the union picketed and distributed handbills at neutral plaintiff's retail outlet; the neutral plaintiff in this case brought and won a case in front of the NLRB).

[52] *See generally BE & K Const. Co. v. United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 90 F.3d 1318 (8th Cir. 1996) (holding that Plaintiff's tortious interference claim was preempted under § 303 when a nonunion contractor asserted that the union tortiously interfered by threatening union violence unless the contractor was removed from the project); *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238 (7th Cir. l996) (holding that a state tort law claim of interference with contract was preempted under § 8(e) when Plaintiff alleged the union falsely represented, as an inducement to sign a collective bargaining agreement, that an electric

that tortious interference claims *which arise from a labor dispute* are likely preempted.[53] Here, however, Local 955 points to no facts in Plaintiffs' Complaint establishing that Bimbo or Plaintiffs are neutral parties to a labor dispute; in fact, there is no labor dispute. There are no allegations that Local 955 picketed or boycotted Plaintiffs' business in order to force Bimbo's hand, nor any allegations that any agreement existed to accomplish the same. Further, there are no allegations that Local 955 coerced any party, nor any threat of union violence. Indeed, the NLRB has found that § 8(b)(4) requires an allegation of union coercion: "[s]imply put, as a matter of black-letter law, it is impossible to state a secondary-boycott claim without an allegation of coercive conduct directed at a neutral third party."[54]

Plaintiffs' Complaint alleges that Local 955 conspired with Bimbo to convert and tortiously interfere with Plaintiffs' Distribution Rights. A judgment for Plaintiffs on these state-law tort claims—based on the facts alleged in the Complaint—would not interfere with the "integrated scheme of regulation" established by the NLRA, nor would it interfere with the underlying purpose of federal preemption in the labor context: limiting state and federal authority over *labor disputes*.[55] To sustain its 12(b)(6) motion, Local 955 must show that the facts alleged in the Complaint establish conduct that is arguably prohibited under § 8.[56] At the

---

utility would amend its contract to protect employer's profits; the court found that if an award of damages against the union was granted under state law based on these facts, the federal regulatory system would come unraveled).

[53] *See Milum Textile Servs. Co. & Unite Here!*, 357 NLRB 2047, 2050 (2011) ("Federal courts have held that tortious interference claims arising out of a labor dispute are wholly preempted or, at least, preempted absent outrageous or violent conduct.") (citing *In re Sewell,* 690 F.2d 403, 408 (4th Cir. 1982)) (holding that the Act preempts state law tortious interference with contract claim); *Wilkes-Barre Publishing Co. v. Newspaper Guild of Wilkes-Barre,* 647 F.2d 372, 381-382 (3d Cir. 1981), *cert. denied* 454 U.S. 1143 (1982).

[54] *Allied Mech. Servs., Inc.*, 357 NLRB 1223, 1230 (2011) (dismissing a complaint for failure to state a claim because it failed to allege coercion directed against a neutral third party as required under § 8(b)(4)).

[55] *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 65 (2008) (quoting *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 613 (1986)) (emphasis added); *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of Am. v. Lockridge,* 403 U.S. 274, 286 (1971).

[56] *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).

motion to dismiss stage, the Court cannot find that the facts alleged in Plaintiffs' Complaint establish preemption under § 8(e) or §8(b)(4).

### 2. Section 303 of the LMRA

Local 955 argues that § 303 of the LMRA provides an exclusive right of action for conduct that violates § 8(b)(4) and § 8(e). In § 303 of the LMRA, Congress provides an explicit and exclusive means of redress in federal court for injuries caused by a union's attempt to "threaten, coerce, or restrain any person" for the purpose of forcing or requiring that person to cease doing business with another.[57] However, because the Court has found that Local 955 has not met its burden to show that Plaintiffs' claims are preempted under § 8, § 303 does not apply.

### B. Sufficiency of Plaintiffs' Allegations

Alternatively, Local 955 argues that Plaintiffs have failed to adequately allege the elements of their state law claims of conversion, tortious interference, and civil conspiracy.

### 1. Conversion

Local 955 asserts that Plaintiffs "failed to allege that any agent of the Union exercised control over Plaintiffs' property."[58] Under Kansas law, "conversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."[59] "To state a claim for conversion under Kansas law, a plaintiff must allege that he has been deprived of the use of his property."[60] "To prevail on a conversion claim, plaintiffs must prove that: (1) they possessed a right in the goods or personal chattels; and (2) defendant exercised control over the goods or chattel to the exclusion

---

[57] 29 U.S.C. §§ 187, 158.

[58] Doc. 10 at 5.

[59] *Alexander v. BF Labs Inc.*, No. CV 14-2159-KHV, 2016 WL 5243412, at *5 (D. Kan. Sept. 22, 2016) (citing *Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005)).

[60] *DIRECTV, Inc. v. Lockwood*, 311 F. Supp. 2d 1147, 1149 (D. Kan. 2004) (citations omitted).

of their right."[61] Notably, the allegedly converted property includes Plaintiffs' Distribution Rights, which are intangible property. "Under Kansas law, intangible property rights may be subject to conversion, so long as there exists a present property interest."[62]

To survive a motion to dismiss, Plaintiffs must allege facts showing a plausible claim to a right to the property and that Local 955 or its agents controlled Plaintiffs' intangible property rights. Plaintiffs allege they own Distribution Rights pursuant to a Distribution Agreement with Bimbo. Further, Plaintiffs allege that Local 955 conspired with Bimbo to implement a plan for union drivers to take over Plaintiffs' Route. Here, it is the union drivers who exercised the requisite control over Plaintiffs' property rights to constitute conversion. Accordingly, the issue is whether Plaintiff has alleged facts to support an inference that the union drivers acted as Local 955's agents in converting Plaintiffs' property.[63] "Generally, a union is not responsible for the acts of an employee, unless the employee is an agent of the union."[64] "Whether a union member is the agent of the union is a question of fact; the party seeking to prove that an employee is a union agent must show that the union 'instigated, authorized, solicited, ratified, condoned or adopted' the employee's actions or statements."[65] Here, Plaintiffs allege that Local 955 instigated and authorized a plan, and the "actual materialization" of the plan resulted in the conversion of Plaintiffs' property.[66] To the extent that Local 955 instigated, authorized, and

---

[61] *Alexander*, 2016 WL 5243412, at *5; *see also Parks v. Wells Fargo Bank, N.A.*, No. 16-1096-JTM, 2017 WL 411362, at *3 (D. Kan. Jan. 31, 2017).

[62] *Near v. Crivello*, 673 F. Supp. 2d 1265, 1281 (D. Kan. 2009) (citing *Farmers State Bank v. FFP Operating Partners, L.P.*, 935 P.2d 233, 235–36 (Kan. Ct. App. 1997); *Farm Bur. Mut. Ins. Co. v. Carmody*, 88 P.3d 1250, 1254–55 (Kan. Ct. App. 2004)).

[63] Plaintiffs assert, "[e]ach defendant identified herein is and was the agent, servant, or employee of each of the other defendants . . . ." Complaint, ¶ 5. However, to be entitled to a presumption of truth, Plaintiffs must allege facts to support this legal conclusion. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

[64] *Kitchen Fresh, Inc. v. N.L.R.B.*, 716 F.2d 351, 355 (6th Cir. 1983).

[65] *Id.* (quoting *N.L.R.B. v. Miramar of Cal.*, 601 F.2d 422, 425 (9th Cir.1979)).

[66] Doc 9. at 24.

solicited union drivers to control, and thereby convert, Plaintiffs' property, Plaintiffs have adequately pled that the union drivers acted as agents of Local 955. Drawing all inferences in the light most favorable to Plaintiffs, the Court finds Plaintiffs have sufficiently alleged a conversion claim.

### 2. Tortious Interference

Plaintiffs assert claims for both tortious interference with business relations and tortious interference with a business expectancy. Tortious interference with a business expectancy requires: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.[67] Similarly, tortious interference with business relations requires: (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom.[68]

> Both tortious interference with a contract and tortious interference with contractual expectations or a prospective business advantage are predicated on malicious conduct by the defendant. While these torts tend to merge somewhat in the ordinary course, the former is aimed at preserving existing contracts and the latter at protecting future or potential contractual relations.[69]

Local 955 asserts that Plaintiffs have failed to allege any facts to establish malice and thus, have failed to state a claim. Notably, malice is not an explicit element of either claim. However, malice is implied in an element of both claims, namely, intentional misconduct (in a

---

[67] *Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 151 (Kan. 2003).

[68] *Id*. at 150.

[69] *Id*. at 151 (citing *Turner v. Halliburton Co.*, 722 P.2d 1106 (Kan. 1986)).

claim for tortious interference with a business expectancy) and absence of justification (in a claim for tortious interference with business relations).[70] Further, "[t]he issues of defendants' motive and the presence or absence of malice are typically questions for the jury."[71]

Here, Plaintiffs have alleged that Local 955 intentionally conspired with Bimbo to interfere with Plaintiffs' business, despite knowledge that Plaintiffs owned exclusive Distribution Rights.[72] Local 955 responds that "[c]ourts have made clear that knowledge alone is not enough to support a claim" for tortious interference.[73] The Court finds Local 955's argument to be without support. Here, Plaintiffs have alleged Local 955's specific knowledge of Plaintiffs' exclusive Distribution rights, coupled with context: Local 955's goal of transitioning Bimbo from independent operators to union drivers. Plaintiffs have pled malice with plausibility. Accordingly, Local 955's motion to dismiss on the tortious interference claims is denied.

### 3. Civil Conspiracy

Civil conspiracy requires, "(1) two or more [entities]; (2) an object to be accomplished; (3) a meeting of minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages proximately caused by those acts."[74] Local 955 challenges the fourth element, claiming that because Plaintiffs failed to establish a prima facie case for any other tortious cause of action, the claim should be dismissed. Because the Court denied Local 955's motion to dismiss Plaintiffs' conversion and tortious interference claims, Local 955's argument necessarily

---

[70] *Id*. at 152. ("The term 'justification'. . . connote[s] lawful excuse which excludes actual or legal malice.").

[71] *Id*.

[72] Plaintiffs assert that Plaintiffs' counsel sent Local 955 a letter on Oct. 27, 2017 explaining Plaintiffs' ownership of the Distribution Rights.

[73] Doc. 8 at 15.

[74] *Rezac Livestock Comm'n Co. v. Pinnacle Bank*, 255 F. Supp. 3d 1150, 1175 (D. Kan. 2017).

fails.  Accordingly, the Court also denies Local 955's motion to dismiss Plaintiffs' civil conspiracy claims.

**IT IS THEREFORE ORDERED BY THE COURT** that Local 955's Motion to Dismiss (Doc. 7) is **denied**.

**IT IS SO ORDERED.**

Dated: November 28, 2018

S/ Julie A. Robinson<br>
JULIE A. ROBINSON<br>
CHIEF UNITED STATES DISTRICT JUDGE